IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA     :
                                  :
         v.                   :   CRIMINAL ACTION NO.
                                    :   1:11-CR-0377-WSD-CCH
EDGAR CRUZ                        :
                                    :

## **<u>ORDER FOR SERVICE OF REPORT AND RECOMMENDATION</u>**

Attached is the Report and Recommendation of the United States Magistrate Judge in this action in accordance with 28 U.S.C. § 636(b)(1) and this Court's Criminal Local Rules 12.1(E) and 58.1(A)(3).

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections to the Report and Recommendation within **fourteen (14) days** of service of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. *See United States v. Gaddy*, 894 F.2d 1307, 1315 (11th Cir. 1990). The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. Failure to object in accordance with this rule waives a party's right to review. FED. R. CRIM. P. 59(b)(2).

Pursuant to 18 U.S.C. § 3161(h)(1)(H), **the above-referenced fourteen (14) days allowed for filing objections are EXCLUDED from the computation of time under the Speedy Trial Act ("the Act"), whether or not objections are actually filed.** If objections are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time all time between the filing of the Report and Recommendation, and the submission to the District Judge, along with any objections, responses and replies thereto. 18 U.S.C. § 3161(h)(1)(D), (H); *Henderson v. United States*, 476 U.S. 321, 331 (1986); *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir. 1983). The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

IT IS SO ORDERED this 19th day of March, 2012.

_____

C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA      :
     :
       v.        :   CRIMINAL ACTION NO.
     :   1:11-CR-0377-WSD-CCH
EDGAR CRUZ      :
     :

## REPORT AND RECOMMENDATION

Defendant Edgar Cruz ("Defendant") is charged in the indictment with one count of possession with intent to distribute a controlled substance (cocaine) in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(ii), one count of possession with intent to distribute a controlled substance (methamphetamine) in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii), one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c), one count of possession of a firearm in or affecting interstate commerce following conviction for a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and one count of being an alien found within the United States after having previously been deported and removed from the United States without having obtained express consent to re-apply for admission in violation of 8 U.S.C. § 1326(a), (b)(2).

This action is before the Court on Defendant's Motion to Suppress Evidence (the "Motion") [15][23].[1] The Court held an evidentiary hearing on Defendant Cruz's Motion on October 28, 2011, and a transcript of that hearing [19] was filed on November 18, 2011. Due to an illness, Counsel for Defendant was unable to file Defendant's post-hearing brief [23] in support of his Motion until December 10, 2011. Thereafter, the Government sought and received an extension of time in which to file a response brief due to a delay in receiving the transcript and a change in the Assistant United States Attorney assigned to the case, *see* Motion [24] and Order [25], and the Government filed its response to the Motion on February 21, 2012 [27]. Finally, Defendant filed his reply brief in support of the Motion on March 5, 2012 [28]. The Motion was then submitted to the undersigned.

Having heard the evidence and having reviewed the transcript of the evidentiary hearing and the briefs of the parties, the undersigned **RECOMMENDS** that Motion to Suppress Evidence [15][23] be **DENIED**.

---

[1] Although Defendant has filed only one Motion to Suppress, the Clerk docketed Defendant's supplemental brief [23] in support of that motion as a separate motion.

# FINDINGS OF FACT

1.  On June 15, 2011, Cobb County duty police officer Paul Kristjanson responded to a dispatch regarding a shot person at 4103 Allegiance Avenue. *See* Transcript of March 23, 2011 Hearing ("T.") at 19. Among other officers also responding to the dispatch call were Cobb County Police Officer William Nerio and Cobb County Patrol Officer Amias Gossett. T. at 73–75, 115–16.

2.  Officer Kristjanson arrived at the address approximately two minutes after receiving the dispatch call, and he observed other officers already in the vicinity of Defendant, who was sitting on steps by the back door of 4103 Allegiance Avenue. T. at 19–22, 25.

3.  Defendant's neighbor, Mr. Miranda, who lived at 4103 Allegiance Avenue and was the person who had called 911, was still on the phone with the 911 operator when Officer Kristjanson arrived. T. at 41.

4.  Officer Kristjanson observed that Defendant's shoulder was soaked with blood and that the back of Defendant's head was cut and bleeding, and Officer Kristjanson deduced that Defendant was the victim of the reported shooting. T. at 26–27.

5.      Officer Kristjanson testified that Mr. Miranda pointed to the adjacent house, located at 4095 Allegiance Avenue, and indicated that the shooting had occurred there.  T. at 29–30.  The focus of the other officers on the scene thereafter shifted next door.  T. at 29–30.

6.      Officer Kristjanson spoke with Defendant, who told him that two black males had knocked on his door, entered the home, and put him on the floor, and that the shorter of the men pistol whipped Defendant and kept him on the floor while the taller assailant searched the house.  Defendant reported that, when the taller assailant returned from searching the house, he shot Defendant.  T. at 36.

7.      Officer Kristjanson testified that Defendant told him that he thought the two men ran out of the back of the house, and that other residents or possible occupants of the house were not present during the attack.  T. at 36, 50, 68.

8.      At some point thereafter, Officer Kristjanson relayed over the radio Defendant's description of the assailants, the fact that they were armed, and that Defendant thought they went out the back door of his home.  T. at 38, 57–58.

9.      Meanwhile, Officer Nerio had also responded to the dispatch call of a shot person on June 15, 2011 and arrived within minutes of the call at the scene.  T. at 73–75.

10.     Following the lead of other officers already present at the scene, Officer Nerio positioned himself at the back of 4095 Allegiance Avenue to make sure no one entered or exited the house.  T. at 75–76.

11.     Officer Nerio testified that "at the time we didn't have — or at least I didn't have much information of what was going on.  I just knew that somebody had been shot.  I didn't know if anybody else inside was shot or we didn't know if perpetrators were inside.  We didn't know if somebody else with handguns were inside."  T. at 78.

12.     Other officers arrived, and around five officers, including Officers Nerio and Gossett, entered 4095 Allegiance Avenue from the back of the house with guns drawn and cleared the house in segments, searching for perpetrators or victims who may need medical help in "anyplace that a person could hide."  T. at 80–81, 116, 120.

13.      The team of officers cleared the house in a few minutes and exited out of the back door. T. at 85. Officer Nerio, the last to exit the house, testified that only seconds after exiting the house as he was crossing the patio, he heard a "thump" coming from behind him in the direction of the house. T. at 86, 106. The "thump" "scared the hell of out [him]" and caused him to immediately turn around and draw his gun. T. at 86–87.

14.      Officer Nerio alerted the other officers of the noise he had heard, and Officer Gossett testified that Officer Nerio had said something to the effect of "did y'all hear that?" "I just heard a noise, someone moving inside the residence." Officer Gossett testified that, as Officer Nerio was saying that he heard a noise, Nerio had his gun drawn. T. at 86–87, 122–24.

15.      Officer Demeres also heard a noise coming from the direction of the house, and the other officers acknowledged that Officer Nerio said he heard a noise. As a result, the team of officers re-entered the house through the back door, guns drawn, to again look for a person hidden within the residence in places where a person could be hiding, such as under beds or inside closets. T. at 88, 123, 243–47.

16.     Officer Gossett, who had cleared the left side of the house on the initial sweep, cleared the right side of the house upon re-entry.  During that second sweep, Officer Gossett located a hole in the ceiling of a bedroom closet on the right side of the house which was large enough to fit an adult person.  The area through the hole in the ceiling had not previously been cleared.  T. at 89–90, 125–28.

17.     Officer Gossett noticed scuff marks on the interior wall of the closet, below the hole in the ceiling, that appeared to have been made by the shoes of a person climbing into the hole.  T. at 126, 131–32, 195–96.

18.     Officer Gossett testified that he was concerned that an armed assailant could have climbed into and be hiding in the attic, and he believed that the attic had not been cleared and was not secure.  T. at 133.

19.     Because entering the attic to clear it would expose the head of an officer climbing into the hole, Officer Gossett requested either a pole mirror in order to make sure there was no one aiming a gun at the hole or a Kevlar helmet to protect the head of whichever officer was going to climb into and clear the attic. T. at 133–35.

20.   While he was waiting for an officer to arrive with the specialized equipment, Officer Gossett stood guard with his shotgun pointed at the hole in the attic for an estimated 10 to 15 minutes.  T. at 136.

21.   K-9 Officer Kenneth Craig Robinson subsequently arrived at the scene with a Kevlar helmet.  T. at 137, 187.

22.   Upon arrival, Officer Robinson was told that a hole in the attic as well as a crawl space had not yet been cleared.  T. at 187–88.

23.   Officer Robinson deployed his canine to search the uncleared exterior crawl space, which was promptly cleared, and then Robinson proceeded into the house to assist with the search of the attic.  T. at 188–92.

24.   After entering the house, Officer Robinson's canine appeared to alert towards the ceiling.  Based on the information he had received and the dog's apparent alert, Officer Robinson believed that a human threat might exist in the attic.  T. at 194–95, 219.

25.   Officer Robinson put on the Kevlar helmet and climbed into the attic through the hole in the closet identified and guarded by Officer Gossett.  T. at 197–99.

26.    As he was climbing into the attic, Officer Robinson knocked over a printer box that appeared to contain opaque cellophane packaging containing illegal narcotics.  T. at 202–03.

27.    Inside the attic, Officer Robinson drew his weapon, activated a flashlight, and visually scanned the space for threats.  T. at 198–99.

28.    While scanning for threats, Officer Robinson observed a trash can which was in plain view with dark-colored cellophane wrapped packages that, based on Officer Robinson's experience and training, appeared to contain illegal narcotics.  T. at 199, 231–33.

29.    While crawling to the front area of the attic, Officer Robinson put his hand on a bag that seemed to contain packaged narcotics.  T. at 203.

30.    While lowering himself from the attic, Officer Robinson's hand slipped off a floor joist onto a green towel, which felt like the butt of a weapon.  T. at 204–05.

31.    When Officer Robinson came down from the attic, he reported that the attic was "all clear" and said that they "need to start tracking operations."  T. at 206.

32.     Officer Robinson also told the detectives on the scene that "there appeared to be a sizable quantity of illegal narcotics up there." T. at 206.

33.     Officer Robinson testified that he encountered the items in plain view in the attic in the midst of his search for a human threat and that "he was moving through the attic as quickly as the structure would allow and looking for additional humans in the attic." T. at 203–04.

34.     Based on Officer Robinson's observations, a search warrant was subsequently obtained and executed at 4095 Allegiance Avenue on June 15, 2011. T. at 234.

## **DISCUSSION**

Defendant has moved to suppress evidence obtained during the search of 4095 Allegiance Avenue. There is no dispute that the items later seized pursuant to a search warrant were within the plain view of Officer Robinson when he searched the attic space and that their criminal nature was readily apparent. The central issue in this case is whether Officer Robinson had a legal right to be the attic when he spotted the alleged illegal narcotic drugs and weapon. To that end, Defendant argues that exigent circumstances did not exist to justify the warrantless search of his residence, that no reasonable basis existed to support the notion that the assailants could still be in the

house, and that the noise heard by Officer Nerio after the initial protective sweep did not provide a reasonable basis to re-enter Defendant's residence.

The Fourth Amendment protects people against unreasonable government searches and seizures that intrude on their reasonable expectations of privacy. U.S. Const. amend. IV; *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *United States v. Place*, 462 U.S. 696, 706-07 (1983). Accordingly, a search or seizure must normally be conducted under the authority of a court-issued warrant, supported by a finding of probable cause to believe that evidence of a crime will be found in the targeted location. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989); *Mincey v. Arizona*, 437 U.S. 385, 390 (1978).

Warrantless searches are *per se* unreasonable under the Fourth Amendment, subject to only a few specifically established and well-delineated exceptions. *Payton v. New York*, 445 U.S. 573, 603 (1980); *Katz v. United States*, 389 U.S. 347 (1967). Because a warrantless search or seizure is presumptively invalid, the burden is ordinarily on the Government to establish by a preponderance of the evidence that a particular exception to the warrant requirement applies. *Lego v. Twomey*, 404 U.S. 477, 92 S. Ct. 619 (1972); *Vale v. Louisiana*, 399 U.S. 30, 34 (1970). Under the doctrine commonly known as the exclusionary rule, evidence is inadmissible if it is

obtained through a search and seizure that is conducted without a warrant and is not subject to one of the specific exceptions to the warrant requirement. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

One such exception is the "plain view" doctrine. It permits a police officer to seize items of evidentiary value when they are observed. For the discovery to be valid, however, the United States Supreme Court has stated that three conditions must be met. First, the officer must not have violated the Fourth Amendment "in arriving at the place from which the evidence could be plainly viewed." *Horton v. California*, 496 U.S. 128, 136 (1990). Second, "not only must the item be in plain view; its incriminating character must also be 'immediately apparent.'" *Id.* (internal citations omitted). Third, "not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself." *Id.* at 137.[2]

As stated above, there is no argument offered by Defendant that the items seized from his residence were not in plain view nor that their incriminating character was not immediately apparently. Further, the evidence seized in this case was first

_____

[2] The evidence seized in this case was first observed by officers conducting a sweep of the residence at 4095 Allegiance Avenue, but the items were not taken into police custody until later in the day, after a search warrant had been obtained using the information discovered during the sweep.

observed by officers conducting a sweep of the residence at 4095 Allegiance Avenue, but the items were not taken into police custody until later in the day, after a search warrant had been obtained using the information discovered during the sweep. Thus, the second and third elements of the plain view doctrine are not in dispute here. Rather, Defendant's argument is that because officers were not lawfully in the attic of his residence, the plain view discovery of the alleged illegal narcotics and weapon violated the Fourth Amendment, and the subsequent seizure of those items pursuant to a search warrant was a consequence of that Fourth Amendment violation, and therefore, subject to the exclusionary rule.

The Government argues that the search of Defendant's residence in this case was reasonable based on exigent circumstances and on the fact that the officers were properly conducting a "protective sweep." The Court agrees, and for the reasons discussed below, **RECOMMENDS** that Defendant's Motion to Suppress [15][23] be **DENIED**.

1.  *Protective Sweep in Exigent Circumstances*

In *United States v. Holloway*, the Eleventh Circuit held that exigent circumstances justified a warrantless search of a house based on a 911 report of gunshots and arguing coming from the house. *United States v. Holloway*, 290 F.3d

1331 (11th Cir. 2002). The court explained that "when exigent circumstances demand an immediate response, particularly when there is danger to human life, protection of the public becomes paramount and can justify a limited, warrantless intrusion into the home." *Id.* at 1334. The goal in such circumstances is not to discover evidence of a crime, but to rescue any victims and ensure the safety of the public and officers. *Id.* at 1338. In particular, when confronted with emergency situations, "police must act quickly, based on hurried and incomplete information. Their actions, therefore, should be evaluated by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Id.* at 1339. As the Supreme Court has held, "[t]his is simply a corollary of the principle . . . that no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.'" *Horton v. California*, 496 U.S. 128, 137 n.7 (1990).

Once police have entered a dwelling without a warrant due to exigent circumstances, the Supreme Court has held that officers may also conduct a protective sweep of the premises "to ensure their own safety." *Maryland v. Buie*, 494 U.S. 325, 334 (1990); *see also United States v. Rivera-Pablon*, 2010 WL 5349483, at *12 (N.D. Ga. Aug. 9, 2010) (after lawfully entering a residence based on exigent circumstances, police may conduct a "protective sweep to determine if anyone inside the residence

poses a threat to law enforcement or whether anyone is injured and requires assistance"). A protective sweep is "a quick and limited search of premises [which] is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327. While *Buie* held that a protective sweep was appropriate, incident to the execution of an arrest warrant, other courts, including the Eleventh Circuit, have found that a protective sweep is permissible whether an arrest warrant, a search warrant, or the existence of exigent circumstances prompts police entry. *United States v. Carabollo*, 595 F.3d 1214, 1224 (11th Cir. 2010); *United States v. Martins*, 413 F.3d 139, 150 (1st Cir. 2005).

The Supreme Court set forth two standards in *Buie* to determine whether police officers were allowed to search the home of an individual being arrested. Under the first standard, "as a precautionary matter and without probable cause or reasonable suspicion," officers may, incident to the arrest, "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* This has been characterized as a type-one *Buie* search. *See United States v. Sunkett*, 95 F.Supp.2d 1367, 1368 (N.D. Ga. 2000). Under the second standard, police officers must possess "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on

15

the arrest scene." *Buie*, 494 U.S. at 334. This has been characterized as a type-two *Buie* search. *See Sunkett*, 95 F.Supp.2d at 1368. As a further cautionary measure, the Supreme Court stated that the protective sweep "may extend only to a cursory inspection of those spaces where a person may be found." *Buie*, 494 U.S. at 335.

In this case, the police officers on the scene were responding to a dispatch call concerning a shooting. Findings of Fact ("FOF") ¶ 1. The victim was badly wounded, and he reported that there were two armed assailants who had entered his home. FOF ¶¶ 4, 6. While the victim "thought" that his assailants had left his home, the officers believed that they needed to clear the house in order to make sure there were no perpetrators still in the home, there were no victims in the home requiring medical assistance, and there was not a threat of gunfire coming from the residence reaching officers searching the surrounding area. FOF ¶¶ 7, 11, 12. The situation was a volatile, ongoing emergency of the type justifying a warrantless search under *Holloway,* and accordingly, exigent circumstances existed justifying the officers' entry into the residence without a warrant, and conducting a protective sweep of the residence was reasonable.

Once inside the home, the officers limited their protective sweep of the premises to areas in which an attacker or a victim could be hiding. FOF ¶ 12. This

initial sweep was quickly executed and consisted of looking in appropriate areas, such as under beds and in closets.  FOF ¶ 12.  As they left the house following this initial sweep, Officer Nerio, the last to leave, heard a "thump" coming from the direction of the house causing him to think "someone [was] moving inside the residence."  FOF ¶¶ 13, 14.  Officer Demeres also heard a noise coming from the direction of the house.  As a result, the police re-entered the house and again searched those areas in which a person could be hiding.  FOF ¶¶ 15, 16.  In doing so, they discovered a hole in the ceiling of a closet which led to an attic area that had not been cleared previously.  FOF ¶ 16, 18.  The hole was large enough for an adult person and looked from shoe marks on the walls beneath like it had been accessed recently by a person.  FOF ¶¶ 16–18.  Before climbing into and clearing that space, Officer Gossett requested a pole mirror or Kevlar helmet as a safety measure.  FOF ¶ 19.  While he waited for that equipment to arrive, Officer Gossett kept his weapon trained on the opening to ensure that there was not a remaining attacker hiding there who might pose an immediate danger to officers who were searching the surrounding area.  FOF ¶¶ 18, 20.

Subsequently, Officer Robinson arrived.  He had a Kevlar helmet and climbed into the opening in the ceiling in order to visually clear that space as part of the protective sweep.  FOF ¶¶ 21, 25.  Once inside the attic, Officer Robinson saw, in plain view, what appeared to him, based on his experience, to be large quantities of

illegal narcotics.  FOF ¶¶ 26–29.  He also felt what he thought was the butt of a weapon when he slipped while climbing in the attic.  FOF ¶ 30.

Defendant argues that Officer Robinson had no right to be in the attic, and thus, that the "plain view "exception to the warrant requirement did not apply.  In his brief in support of the Motion, defense counsel appears to argue that it was unreasonable for law enforcement officers to enter his home at all, since Defendant had told Officer Kristjanson that he "thought" the assailants exited the house toward the backyard and that no other occupants of the house were home at the time of the attack.[3]

The Court finds, however, that the fact that Defendant reported that he "thought" the attackers had left his house did not make it unreasonable for officers to conduct a protective sweep of the house.  First, not only was Defendant's report uncertain, but he was severely injured and Officer Kristjanson could reasonably have doubted the accuracy of Defendant's account.  FOF ¶ 4.  Second, that Defendant believed the house was empty did not render the situation safe for officers to conduct a search of the surrounding area without first securing the house and ensuring that armed assailants would not fire upon police who were scanning the woods behind the

---

[3]At the hearing on the Motion, however, defense counsel conceded that he was not arguing that the police were not engaged in a lawful protective sweep when they first entered Defendant's home.  T. at 11.

house with their backs turned to the building. As the court noted in *Holloway*, "police must act quickly, based on hurried and incomplete information. Their actions, therefore, should be evaluated by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Holloway*, 290 F.3d at 1339. Accordingly, the Court finds that, in light of the hurried, emergency nature of responding to a shooting, the stakes involved in making sure victims and perpetrators were not still in the building in which gunshots had recently been fired, and the lack of certainty surrounding Defendant's account of the gunmen's whereabouts, it was reasonable for the officers on the scene to enter the residence and conduct a protective sweep of the areas in which a person could be hiding. *Accord United States v. Carlisle*, 2008 WL 141482, at \*4 (N.D. Fla. Jan. 11, 2008) (applying *Holloway* and holding that deputies faced with an emergency situation in responding to a 911 call involving a shooting acted reasonably in conducting a protective sweep of a victim's house even though the victim reported that there were no other victims or attackers still in the residence).

Defendant also makes much of the fact that the officers' protective sweep was conducted in distinct phases. While the reasonableness of re-entry upon Officer Nerio's hearing a "thump" is discussed below, the Court notes that nothing in the law

requires that fully clearing a building during a protective sweep must be accomplished in a single pass. Further, when the previously uncleared hole to the attic was discovered on the second sweep of the house, it was reasonable to inspect the additional area through that hole since, as discussed above, it was large enough to harbor a victim or perpetrator and was not yet secured. FOF ¶ 16. Finally, although there was a time lapse between the initial dispatch call, the first protective sweep of the house, the immediate re-entry into the house after a noise was heard, and the final clearing of the attic after Officer Robinson arrive with the appropriate equipment, the record reflects that the officers proceeded with the sweep as soon as sufficient officers and equipment were present to safely enter the house, and there is no evidence of unnecessary delay on the part of law enforcement. FOF ¶ 12.

2.    *Mistake of Fact*

While the Court finds that exigent circumstances and immediate danger justified the officers' entering the residence and conducting the initial protective sweep, the Court must also decide whether the re-entry by officers into the house to conduct a more extensive sweep was appropriate. Defendant's principal argument is that Officer Nerio's hearing a "thump" was not a reasonable basis to re-enter the

house and conduct a warrantless search of the attic where alleged illegal narcotics and weapons were ultimately spotted in plain view (or plain feel) by Officer Robinson.

After finding no signs of humans, either perpetrators or victims, in the house on the first sweep, the group of five officers exited out of the back door of the house. FOF ¶ 13. Nerio, the last of the five to exit the house and closest to the house, heard a loud "thump" as he was crossing the patio immediately adjacent to the back door. Officer Nerio testified that the thump "scared the hell out of [him]" and caused him to turn around and draw his weapon in defense. FOF ¶¶ 13–14. Officer Demeres also heard a noise, and it is undisputed that other officers knew that Officer Nerio claimed to have heard a noise and felt that there might be someone still in the residence. FOF ¶¶ 13, 15.

Defendant argues that this noise would have to have been caused by someone immediately visible to Officer Nerio, and that when he turned around and saw nobody behind him, re-entry into the house and a more extensive protective sweep was unreasonable and unnecessary. Defendant further posits that the noise may not have happened and that the thump could not have come from the attic area which was subsequently searched.

For the reasons discussed above, the Court finds that the officers' response to Officer Nerio's report of hearing a loud thump which scared him and caused him to raise his weapon in self defense was reasonable. The officers were responding to an emergency situation involving a shooting, and clearing the place where the shooting occurred was reasonable in light of the paramount importance of ensuring the safety of all persons on the scene. The fact that officers never identified the source of the noise does not undermine the reasonableness of re-entry. *See Holloway*, 290 F.3d at 1340 ("The fact that no victims are found, or that the information ultimately proves to be false or inaccurate, does not render the police action unlawful."). Similarly, the fact that Officer Nerio may have been mistaken about the source of the noise does not make the additional protective sweep to clear the house of threats improper, so long as that mistake of fact was reasonable. *United States v. Chanthasouzat*, 342 F.3d 1271, 1276 (11th Cir. 2003) ("Thus, if an officer makes . . . a mistake of fact, the only question is whether his mistake of fact was reasonable. Great deference is given to the judgment of trained law enforcement officers 'on the scene.'"). Finally, the fact that the noises heard by Officers Nerio and Demeres were not specifically identified as coming from the attic does not make the subsequent focus on clearing the attic unreasonable. Once re-entry for a further protective sweep was undertaken and the adult-sized hole in the closet ceiling with shoe scuff marks below was discovered, it

was reasonable for the officers to secure the uncleared area accessed through that hole before leaving the premises.

In sum, while Defendant contends that the police only wanted to search his house to find illegal drugs, all evidence in the record points to the contrary. Officers entered the house to conduct a brief initial protective sweep and exited to go pursue the perpetrators in the surrounding area. FOF ¶ 13. Only upon two officers' hearing a noise coming from the direction of the house and Officer Nerio's turning in fear with his gun raised toward the house did the police decide to re-enter the premises. FOF ¶¶ 13–15. When Officer Gossett discovered the uncleared attic area through the hole in the closet ceiling, he did not immediately enter the area to search for illegal contraband, but instead trained his weapon on the hole and waited for protective equipment to arrive so an officer could safely enter the area and visually check to make sure there were no victims or perpetrators hiding there. FOF ¶¶ 16–20. His actions evidence that the officers were concerned that persons, not drugs, were in the attic. While Defendant seeks to make an issue out of the fact that Officer Robinson's dog, who was trained to detect both drugs and people, alerted towards the attic when he was brought into the house, as Officer Gossett's actions demonstrate, the decision to clear the attic space was made long before the dog arrived at the scene and with a concern that people, not drugs, may be in the attic. FOF ¶¶ 19, 24. Thus, the Court

finds that the evidence reflects that the officers conducting the protective sweep in this case were interested in safety, not discovering illegal narcotics, and that they were lawfully in the attic conduct a lawful protective sweep when the evidence Defendant seeks to suppress was either seen or felt in plain view by the officer clearing the attic.

## CONCLUSION

For all the reasons discussed above, **IT IS RECOMMENDED** that Defendant's Motion to Suppress [15][23] be **DENIED**.

**IT IS SO RECOMMENDED** this 19th day of March, 2012.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE